IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

CHRYSTAL ANN MCCONNELL,

    Plaintiff,

v.

HYATT HOTELS CORPORATION,
HYATT PLACE FRANCHISING, LLC,
NOBLE INVESTMENT GROUP, LLC,
NF II BOULDER OP CO, LLC,
HP BOULDER LLC,
INTERSTATE HOTELS & RESORTS, INC.,
NOBLE-INTERSTATE MANAGEMENT GROUP, LLC,
PEDERSEN DEVELOPMENT COMPANY, L.L.C.,
3001 PEARL, LLC,
SHORT ELLIOTT HENDRICKSON, INC.,
JAY LARSSON,
LARSSON DESIGN,
MILENDER WHITE CONSTRUCTION CO.,
GIVEN & ASSOCIATES, INC.,
DESIGN MECHANICAL INCORPORATED, and
MARXAIRE, INC.,

    Defendants.

## COMPLAINT AND JURY DEMAND

## PARTIES

**Chrystal Ann McConnell**

1.     Plaintiff Chrystal Ann McConnell is an Arizona citizen.

2. Ms. McConnell was a guest at the Hyatt Place Boulder / Pearl Street Hotel located at 2280 Junction Place, Boulder, Colorado, 80301 (hereinafter the "Hotel") from November 16 through 19, 2018.

3. As a result of Defendants' wrongful acts and omissions, while staying at the Hotel, Ms. McConnell was poisoned by carbon monoxide ("CO") gas. As a result, she suffered significant and permanent injuries.

**Hyatt Hotels Corporation and Hyatt Place Franchising, LLC**

4. Hyatt Hotels Corporation ("HHC") is a Delaware corporation whose principal place of business is in Chicago, Illinois.

5. Hyatt Place Franchising, LLC ("HPF") is a Delaware limited liability company whose principal place of business is in Chicago, Illinois.

6. HHC owns a multinational hospitality company that owns, manages, and franchises luxury hotels, resorts, and vacation properties, collectively comprising the "Hyatt Hotels group."

7. The Hyatt Hotels group encompasses numerous hotel brands (19 in total) and more than 850 properties.

8. The Hyatt Hotels group uses a unified loyalty rewards system known as the "World of Hyatt."

9. HHC operates its hotels under three models: franchise, management, and ownership.

10. In practice, with respect to their control over the Hotel and other franchised properties, there was no distinction between HHC and HPF. They acted through the same employees and agents.

11. HHC is listed as the "Owner" and "Owner/Manager" on architectural plans and drawings for the Hotel.

12. Moreover, numerous individuals on the Hotel design "Project Directory" publicly held themselves out as high-ranking HHC officers at the time of Hotel's design and construction.

13. HHC and HPF required Noble, NF, and HP to strictly comply with its Design Standards and System Standards, which regulated heating, ventilation, air conditioning, and life safety equipment and systems.

14. HHC and HPF had control over whether the Hotel would open for business.

15. Creating a uniform experience across the Hyatt Hotels group enhances HHC and HPF's profits.

16. In pursuit of this goal, HHC and HPF retain and exercises a pervasive right of control over many aspects of franchised hotels withing the Hyatt Hotels group.

17. HHC and HPF's tools of control include, but are not limited to:

   a. their franchise agreements;

   b. their building specifications;

   c. their design standards;

   d. their system standards regulating virtually every aspect of hotel operation;

   e. their management, personnel, and operational training programs; and

   f. their scheduled and unannounced inspections and audits.

18. HHC and HPF also strive to conceal from their guests whether they are patronizing a company-owned location, a company managed location, or a franchised location.

19. HHC and HPF are aware that many of its patrons trust the Hyatt brand and know this trust would be eroded if its patrons were aware that a particular facility was owned and operated by a separate company.

20. HHC and HPF cultivate the appearance of common ownership across the Hyatt Hotels group by measures including but not limited to:

   a. extensively displaying its branded names and marks on signage, uniforms, business cards, carpets, towels, and other physical items;

   b. failing to differentiate HHC owned and operated locations from managed and franchised locations on their website and internet reservation system; and

   c. maintaining a common system of rewards membership and points across the Hyatt Hotels group.

**Noble Investment Group, LLC; NF II Boulder Op Co, LLC; and HP Boulder, LLC**

21. Noble Investment Group, LLC ("Noble") is a Georgia limited liability company whose principal place of business is in Georgia.

22. NF II Boulder Op Co, LLC (hereinafter "NF") is a Delaware Limited Liability Company whose principal place of business is in Georgia.

23. HP Boulder, LLC (hereinafter "HP") is a Delaware limited liability company whose principal place of business is in Georgia.

24. NF and HP are among Noble's subsidiaries.

25. Noble, NF, and HP share the same principal place of business.

26. Noble, NF, and HP operate through the same officers, employees, and agents, including in transactions with each other.

27. In January of 2019 NF executed a Special Warranty Deed that purported to convey the Hotel premises to nonparty Sreit HP Boulder PropCo, L.L.C. (hereinafter "Sreit"). However, there is no recorded instrument conveying the premises to NF in the first instance. In March of 2019 HP executed a "Corrective Deed" that purported to convey the Hotel premises to Sreit.

28. In practice, with respect to the Hotel, Noble, NF, and HP operated as a single, unitary entity responsible for owning the Hotel.

29. Internally, Shannan Harrigan, Director of Brand Support for HHC, stated that "Noble" was the Hotel's "owner."

30. HHC exercised substantial control over these entities as well. For example, HHC's recent Assistant Secretary filed a Statement of Foreign Authority on behalf of HP.

31. HHC/HPF controlled Noble/NF/HP's selection of a property manager.

32. During ongoing failures of the Hotel's HVAC system after construction was supposedly complete, Noble Executive Vice President Kevin Grass conducted walkthroughs on the Property, received most or all of the reports of HVAC failures, and met with the Hotel's General Manager, Susi Keating, regarding the failures.

**Interstate Hotels & Resorts, Inc. and Noble-Interstate Management Group, LLC**

33. Interstate Hotels & Resorts, Inc., ( "IHR") is a Delaware corporation whose principal place of business is in Texas.

34. Noble-Interstate Management Group, LLC ( "NIMG") is a Georgia limited liability company whose principal place of business is in Texas.

35. NIMG is a subsidiary of a subsidiary of IHR.

36. At the time of the Incident, IHR and NIMG shared a principal office address. When NIMG moved to Plano, Texas, IHR also moved to Plano, Texas.

37. IHR and NIMG operate through the same employees and agents.

38. IHR signed documents on NIMG's behalf. In other words, IHR had control over NIMG entering into contracts.

39. In practice, with respect to the Hotel, IHR and NIMG operated as a single, unitary entity responsible for managing the Hotel.

40. Shortly before the Incident, IHR represented to the public via social media that it employed the staff at the Hotel.

41. Internally, at the time the Hotel opened for business, Shannan Harrigan, Director of Brand Support for HHC, stated that "Interstate Hotels" was the Hotel's "operator."

42. IHR maintained active worker's compensation coverage for the Hotel at the time of the Incident and through January 16, 2019.

**Pedersen Development Company, L.L.C. and 3001 Pearl, LLC**

43. Pedersen Development Company, L.L.C. ("PDC") is a Colorado limited liability company whose principal place of business is in Boulder, CO.

44. Its principal, Scott Pedersen, hired a close group of associates, including his brother Jeff Pedersen (an architect with Short Elliott Hendrickson, Inc.) and friend Jay Larsson to design the Hotel.

45. 3001 Pearl, LLC ("3001") is a Colorado limited liability company whose principal place of business is in Boulder, Colorado.

46. In practice, with respect to the Hotel, PDC and 3001 operated as a single entity.

47. Both PDC and 3001 acted jointly through Scott Pedersen and Jeff Shanahan.

48. 3001 expressly agreed to serve as HP's agent pursuant to a Development Agreement.

49. Pursuant to this Agreement, 3001 was responsible for overseeing every detail the Hotel's design, construction, and onboarding of the manager.

50. While the Development Agreement contains a clause that limits 3001's liability to HP, the Development Agreement is irrelevant to claims brought by a stranger to the Agreement, such as Ms. McConnell.

51. Internally, at the time the Hotel opened for business, Shannan Harrigan, Director of Brand Support for HHC, stated that Jeff Shanahan was responsible for "Business Development" at the Hotel.

52. During ongoing failures of the Hotel's HVAC system after construction was supposedly complete, Noble Executive Vice President Kevin Grass corresponded almost daily with Jeff Shanahan and Scott Pedersen, specifically about the boiler failures.

**Short Elliott Hendrickson, Inc.**

53. Short Elliott Hendrickson, Inc. ("SEH") is a Minnesota corporation whose principal place of business is in St. Paul, Minnesota.

54. SEH provided architectural services including designing the Hotel, preparing and/or approving documents for its construction, and hiring contractors to design its mechanical and electrical systems.

**Jay Larsson and Larsson Design**

55. Jay Larsson is a professional architect. He is a citizen of Sweden, California, Colorado, or Texas but has no known connection with Arizona.

56. Mr. Larsson provided architectural services including designing the Hotel.

57. Larsson Design is a d/b/a for Mr. Larsson without separate corporate existence.

58. However, with respect to the Hotel, Mr. Larsson entered into contracts as "Larsson Design."

59. To the extent that Larsson Design has a separate corporate existence from Mr. Larsson, Larsson Design provided architectural services including designing the Hotel.

60. SEH, through Jeffrey Pedersen, subcontracted with Jay Larsson as a consultant on the Hotel's design.

61. Mr. Larsson signed as "Principal / Larsson Design."

**Milender White Construction Co.**

62. Milender White Construction Co. ("MWC") is a Colorado corporation whose principal place of business is in Arvada, Colorado.

63. MWC was the general contractor during the Hotel's construction and built the Hotel, including the HVAC system and fire/life safety systems.

**Given & Associates, Inc.**

64. Given & Associates, Inc. ("Given") is a Colorado corporation whose principal place of business is in Lakewood, Colorado.

65. Given provided professional mechanical and electrical engineering services in connection with the Hotel's construction.

**Design Mechanical Incorporated**

66. Design Mechanical Incorporated ("DMI") is a Delaware corporation whose principal place of business is in Louisville, Colorado.

67. DMI does business as "Design Mechanical, Inc."

68. SEH hired DMI as a consultant on the HVAC system and DMI serviced the HVAC system.

69. DMI installed the boilers and/or other components of the HVAC system in an improper manner.

**Marxaire, Inc.**

70. Marxaire, Inc. ("Marxaire") is a Colorado corporation whose principal place of business is in Denver, Colorado.

71. Marxaire inspected, maintained, and repaired the HVAC system, including but not limited to the boilers, at the Hotel, on an ongoing basis.

72. Marxaire repeatedly serviced the boilers in the weeks leading up to the poisoning, including cleaning the burners.

73. Marxaire knew or should have known that the boilers were malfunctioning and posed a serious danger of poisoning Hotel guests with carbon monoxide.

74. Marxaire failed to correct the problems with the boilers and, on information and belief, may have caused and/or exacerbated the ongoing problems.

## JURISDICTION & VENUE

75. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) and other applicable law because the suit is between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

76. This Court has jurisdiction over Defendants pursuant to C.R.S. § 13-1-124 and other applicable law because this action arises from Defendants transacting business in Colorado; committing torts in Colorado; and owning, using, and possessing real property in Colorado.

77. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) and other applicable law because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

78. Ms. McConnell is an unnamed member of a putative class action, *Raymond E. Clark et al. v. Hyatt Hotels Corporation et al.*, No. 1:20-cv-01236-RM-SKC, pending in the District of Colorado. As such, Ms. McConnell's claims are timely. *See State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1228 (10th Cir. 2008) ("Colorado has adopted *American Pipe's* class action tolling doctrine.") (collecting cases); *see also Jackson v. Am. Fam. Mut. Ins. Co.*, 258 P.3d 328, 333 (Colo. App. 2011) ("[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." [quoting *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974)]).

## FACTS

### The Threat of Carbon Monoxide Poisoning

79. CO is a colorless, odorless, potentially deadly gas.

80. Gas-fired appliances generate CO as a byproduct of combustion. Poorly maintained and/or poorly ventilated gas-fired appliances create a dramatically higher risk of dangerous levels of CO and a threat to human life.

81. When breathed in, CO enters the bloodstream and triggers a damaging sequence of physiological changes. It deprives the body tissues — including the brain — of oxygen, leading to a cascade of cytotoxic and inflammatory processes. These harmful processes can continue long after the victim is removed from the toxic environment.

82. Initially, CO poisoning mimics common ailments such as food poisoning, a headache, or the flu. The gas also intoxicates victims, inhibiting their ability to think clearly or recognize symptoms.

### Preventing CO Poisoning

83. The danger of CO poisoning and the means of minimizing that danger are common knowledge in the hotel design, construction, maintenance, ownership, operation, and management industries.

84. Due to the potential risk of CO poisoning, it is essential to install a CO alarm whenever a combustion appliance is operated indoors.

85. It is also essential to regularly and properly maintain combustion appliances to ensure that they do not produce deadly levels of CO.

86. Likewise, it is vital to regularly and properly test CO alarms to ensure that they are functioning properly.

87. Preventive maintenance and CO alarms are relatively inexpensive, particularly when compared to the risk of serious injury or death resulting from CO poisoning.

### Defendants' Disregard for Ms. McConnell's Safety

88. Defendants failed to ensure that CO detectors were installed at the Hotel.

89. Defendants designed, constructed, maintained, and serviced the Hotel's HVAC system in an inappropriate manner.  This led to repeated failures of the Hotel's boilers and eventually the CO release that poisoned Ms. McConnell.  It also resulted in CO that was being emitted from the boilers' vent pipes being channeled back into guest rooms and circulated throughout the Hotel.

90. Before Ms. McConnell was poisoned, Defendants actually knew or should have known of the danger to guests staying at the Hotel.

91. Not part of the Hotel was substantially completed until after the Incident. In particular, the HVAC system was constantly being altered and was not substantially completed until after Ms. McConnell was poisoned.

### The Poisoning

92. Ms. McConnell's then-boyfriend purchased a room at the Hotel.

93. Ms. McConnell checked into the Hotel on November 16, 2018.

94. Ms. McConnell checked out of the Hotel on November 19, 2018.

95. Throughout her stay at the Hotel, Ms. McConnell was poisoned. This culminated with an acute CO exposure on November 18.

96. This event was frightening. Ms. McConnell did not understand what was wrong with her.

97. The Hotel was evacuated. During the evacuation, Ms. McConnell was disoriented and had difficulty escaping.

98. As a result of her poisoning, Ms. McConnell has suffered, and will continue to suffer, injuries including without limitation:

    a. Frequent, severe headaches;

    b. Other physical injuries; and

    c. Emotional distress as a result of the traumatic poisoning event.

99. As a result of her poisoning, Ms. McConnell has suffered, and will continue to suffer, damages including without limitation:

    a. Past and future medical and other care expenses;

  b. Physical, mental, and emotional pain and suffering;

  c. Inconvenience;

  d. Permanent physical impairment, including brain injuries; and

  e. Loss of enjoyment of life.

100. Ms. McConnell has been further damaged by the delay in receiving compensation for her injuries. In order to fully compensate Ms. McConnell for her damages an award of prejudgment interest is required.

## CLAIMS FOR RELIEF

### First Cause of Action
### Violation of the Colorado Premises Liability Act
### Against All Defendants

101. At all relevant times Defendants were "landowners" for the purposes of C.R.S. § 13-21-115.

102. At all relevant times, Ms. McConnell was an "invitee" for the purposes of C.R.S. § 13-21-115.

103. Defendants owed Ms. McConnell a duty to exercise reasonable care to protect her against dangers of which Defendants actually knew or should have known.

104. Defendants' duties were nondelegable; i.e., Defendants are not relieved from liability even if they hired independent contractors to discharge their duties. *See Larrieu v. Best Buy Stores, L.P.*, 2013 CO 38, ¶ 15, 303 P.3d 558, 561; *Springer v. City & Cty. of Denver*, 13 P.3d 794, 804 (Colo. 2000).

105. Defendants breached their duties through acts and omissions including, without limitation:

  a. Failing to ensure that carbon monoxide detectors were installed at the Hotel; and

  b. Designing, constructing, maintaining, and servicing the Hotel's HVAC system (including boilers) in an inappropriate manner.

106. Defendants' culpable acts and omissions directly and proximately caused Ms. McConnell's injuries and damages and/or were a substantial factor in causing her injuries and damages.

## Second Cause of Action
## Negligence and Vicarious Liability
## Against All Defendants

107. In the alternative to the First Cause of Action, if for any reason an action under the PLA should fail, Defendants are liable for negligence.

108. By designating this cause of action as one for "negligence," Ms. McConnell does not concede, and specifically disputes, that Defendants acted with simple negligence, as opposed to a higher level of culpability.

109. Defendants had a duty to avoid affirmatively harming Ms. McConnell.

110. In addition, as innkeepers, Defendants HHC, HPF, Noble, NF, HP, IHR, and NIMG, had a special relationship with Ms. McConnell. *See Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 32, 347 P.3d 606, 613.

111. This special relationship gave rise to a duty to exercise reasonable care to prevent harm to Ms. McConnell. *See id.*

112. For those defendants who provided professional architectural or engineering services, they owed a duty to act as reasonably careful members of their profession.

113. Defendants breached their duties of care through the acts and omissions described above.

114. In the alternative, if HHC/HPF did not directly breach their duty of care, then the other Defendants were HHC/HPF's actual agents and sub-agents, and HHC/HPF are therefore vicariously liable for the other Defendants' culpable acts and omissions.

115. In the alternative, if Noble/NF/HP did not directly breach a duty of care, then IHR/NIMG and PDC/3001 and Marxaire were Noble/NF/HP's actual agents and sub-agents, and Noble/NF/HP are therefore vicariously liable for IHR/NIMG and PDC/3001 and Marxaire's culpable acts and omissions.

116. In the alternative, if PDC/3001 did not directly breach a duty of care, then SEH; Jay Larsson; and Larsson Design were PDC/3001's actual agents and PDC/3001 are therefore vicariously liable for their culpable acts and omissions.

117. In the alternative, if PDC did not directly breach a duty of care, then 3001 was PDC's actual agent and PDC is vicariously liable for 3001's culpable acts and omissions.

### Third Cause of Action
### Violation of the Colorado Consumer Protection Act
### Against HHC, HPF, Noble, NF, HP, IHR, and NIMG

118. HPF, NF, HP, and NIMG are "persons" as defined by C.R.S. § 6-1-102(6).

119. McConnell was an actual consumer of HHC/HPF, Noble/NF/HP, and IHR/NIMG's services, specifically, their operation of the Hotel.

120. HHC/HPF, Noble/NF/HP, and IHR/NIMG engaged in deceptive trade practices, including without limitation failing to disclose material information about the Hotel in order to induce consumers to stay at the Hotel. Specifically, HHC/HPF, Noble/NF/HP, and IHR/NIMG failed to inform guests that the Hotel HVAC system was malfunctioning and emitting CO into the Hotel, and that the Hotel lacked any CO alarms.

121. HHC/HPF, Noble/NF/HP, and IHR/NIMG were aware that the Hotel HVAC system was malfunctioning and emitting CO into the Hotel, and that the Hotel lacked any CO alarms.

122. HHC/HPF, Noble/NF/HP, and IHR/NIMG failed to disclose this information to guests and potential guests because, had they disclosed this information, no one would have consumed their services.

123. HHC/HPF, Noble/NF/HP, and IHR/NIMG's deceptive trade practices described above occurred during the course of their business of overseeing, owning, and operating the Hotel.

124. HHC/HPF, Noble/NF/HP, and IHR/NIMG's deceptive trade practices significantly impacted the public.

    a.  On information and belief, hundreds of guests stayed at the Hotel and were poisoned — or at a minimum placed at a severe risk of injury or death — by HHC/HPF, Noble/NF/HP, and IHR/NIMG's deceptive trade practices.

    b.  HHC/HPF, Noble/NF/HP, and IHR/NIMG had exclusive knowledge, as compared to their guests, regarding their HVAC system and lack of CO alarms. This information asymmetry deprived Hotel guests of any bargaining power and rendered Hotel guests vulnerable to HHC/HPF, Noble/NF/HP, and IHR/NIMG's deceptive trade practices.

    c.  On information and belief, the problems with the HVAC system were ongoing for months by the time Ms. McConnell was poisoned, and the Hotel never had CO alarms at any time before Ms. McConnell was poisoned. Therefore, HHC/HPF,

    Noble/NF/HP, and IHR/NIMG's deceptive trade practices impacted hundreds, if not thousands, of prior consumers.

  d. Had HHC/HPF, Noble/NF/HP, and IHR/NIMG offered lodging at the Hotel generally to the public at large. Their deceptive trade practices indiscriminately affected all guests.

125. HHC/HPF, Noble/NF/HP, and IHR/NIMG disclosed that the Hotel HVAC system was malfunctioning and emitting CO into the Hotel, and that the Hotel lacked any CO alarms, Ms. McConnell would not have stayed at the Hotel.

126. Therefore, HHC/HPF, Noble/NF/HP, and IHR/NIMG's deceptive trade practices caused Ms. McConnell's injuries and damages described above.

127. Ms. McConnell has had to hire attorneys to pursue her CCPA claim and is entitled to an award of her reasonable attorneys' fees.

## PRAYER FOR RELIEF

Ms. McConnell respectfully requests that this Court grant judgment in her favor and against Defendants for:

1. Economic damages;

2. Non-economic damages;

3. Physical impairment;

4. Pre- and post-judgment interest;

5. The costs of this action;

6. A reasonable attorneys' fee;

7. Treble damages for all damages awarded pursuant to the CCPA;

8. Any other relief that the Court deems just.

## JURY DEMAND

Pursuant to F.R.C.P. 38, Ms. McConnell respectfully requests a jury trial on all issues.

Dated: 2 November 2021

*s/ Michael F. Lutz*
Michael F. Lutz
The Spence Law Firm, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, WY 83001
307-733-7290
lutz@spencelawyers.com

Attorney for Plaintiff

Address of the Plaintiff:
8851 N. Oracle Rd.
Apt. 351
Tucson, AZ 85704